District Court, Mark Panzeri, representing Appellant Judith Redd. I appreciate the opportunity to express some thoughts about why we believe the District Court abused its discretion in excluding Dr. Sastry's testimony. Three simple but important thoughts that I want to present for your considerations in conjunction with the brief, that we feel the District Court missed these simple things that should have resulted in admitting his testimony. One, Dr. Sastry is the proper expert to explain why this metal product broke. Secondly, this is a manufacturing defect case, and that should make some importance in the analysis, so it involves just the product. And third, Dr. Sastry did exclude the environmental or biomechanical factors in coming to his testimony. The first thought, we feel strongly that the scientific... What does austenitic mean? That is a reference to the phase structure of the microstructure, and it essentially means that it was not ductile enough, didn't meet the ductile and fracture toughness quality of the microstructure, and didn't have, as he explained it, the proper slip systems. If you had a building with 12 support beams versus two support beams, this had to be austenitic, meaning it would have the 12 support beams, and it came out non-austenitic, he explained, has two support beams. And it affects the... And how does an alloy get to be austenitic? Through the heat treatment process during the manufacture of the metal. Mr. Sastry could say precisely how much heat and so forth. I thought he didn't know anything about the manufacturing process. Well, in a strict product liability claim, Your Honor, and this is why the manufacturing defect, this is a manufacturing defect, strict liability claim, the product is what we look at at the end. There's not a negligence claim that Dr. Sastry has to be able to point and say, oh, they only did it at 700 degrees and it was supposed to be 800 degrees. The product came out non-austenitic. There's not a negligence claim that he has to prove here. But he doesn't know the difference that that makes in this product, does he? No, he knows from the... He's studied the formation of metals and alloys his whole career. He knows that if it comes out non-austenitic, he knows that that's because it didn't receive the proper heat treatment. That's what forms the microstructure. That's what he knows from his experience as a metallurgist. So the scientific question of what caused this metal to break. So this alloy has been in use since 1993, and no other stem in this lot has ever had this problem. Nothing has been reported that we know of. Well, how many did he go out and test, any others in the lot? They're presumably implanted in other patients at the moment. Well, maybe some haven't been sold. Is there any discovery of that? I don't believe there was. I don't see where his opinion gets you more than 5% of the way down the road to defect and causation. I mean, I'm not saying it's irrelevant, but when submitted by itself to prove the case, I understand why a very experienced district judge said this doesn't get you there. If that's all you've got. But that is probably the most direct proof, and that's why we feel the metallurgist is the one who can directly explain why the interior structure of this metal was defective. But it's a metallurgist who knows nothing about the manufacturing process or the stresses that the manufactured product comes under. Well, I guess I disagree somewhat. He did have knowledge of manufacturing processes. I understand he said he did not necessarily look at these specific manufacturing records. He has studied the titanium metal. So he studied the third-party contractor's process? He knows exactly when the heat was applied and how much heat should have been applied and the variables that might cause a particular product or not? No, I believe the best way I can answer it is he knows the proof is in the pudding. If it would have been heated properly, it would have been austenitic. He would not have found what he found when he tested the microstructure, and that's what his background is. But other than it was a, as I understand it, DuPuy's standards were to its contractor that the stem was to be austenitic. And they didn't test it when they got it back. Pardon? They did not test it when they got it back. No, but the expert knows nothing about the validity of that standard. They just know he just says there was a standard and this one isn't, so it's defective. And that's what a simple manufacturing defect, product defect case is. It's tested against the standard, and if it was not made according to the way it was intended, that is a defect. And then it becomes whether he can explain how that defect relates to what happened. And this is, I guess, where I had a little bit of a problem. And that's where he doesn't know anything. With the judge found him, she found him specifically qualified to determine whether it was austenitic or not. As I understand it, the expert said it's not austenitic. The standard was it should be. I don't have to look at any external cause. That's enough. Right? Isn't that a fair summary? Except that, and I understand, I cannot deny that he testified that he said I did not consider the external biomechanical factors. And your brief says he didn't have to. Well, what we say. This is enough. Just what you've said this morning. He actually did talk about excluding other factors. And what he said is when he did his examination of the fracture surface and the fracture findings, which included these cleavage-like fractures, the faceted rock features, the slip incompatibility, combined with not seeing the things that he would have expected to see if the fracture was from an external cause. He talked about second phase particles, inclusions, and porosity. He essentially ruled out those environmental external factors being the cause. And it was a simple statement that he made, I think, was the most important thing that we would want the district court to focus on. If you're starting with a product that is inherently, grossly defective to begin with, then the external factors become secondary in determining what caused it to break. Did the expert analyze the reason or causes of the failure of the replacement device? No, he didn't. Why, if you have one that fails and then you have a second one that fails a year later, why are you focusing only on the first one? We believe everything that came in terms of her damages. By the second time, after they had to go in and take out the first one, that was a significant procedure where significant damage to the interior. The second product really, in a sense, didn't have much chance to take place in the form. And so all the damages, we felt, flowed from the original product. Wait, wait, say that again. The second one what? The second product, by the time… Everything was doomed to fail because of the second product? Well, essentially the way they described her bone and tissue, by the time they had to go in and take out the first product with the osteotomy and then try to put in another product, it just wasn't a very good situation. But I thought the bone and tissue was bad. I thought that was, at least, I thought the surgeon's explanation for what happened was that it was because the bone and the tissue and all the other factors involving her health made it, it just never worked. I mean, it never, there was never any growth at the top of the artificial device. And there was testimony to that effect, and a presentation of contrary evidence would be a way to handle that. I mean, that's something that the defendant can present, but there doesn't have to be. Missouri doesn't require the exclusion of every plausible cause. My question was, I don't understand how an expert can be reliable who says, I don't have to worry about external causes and doesn't look at the second failure to see whether that opinion is worth anything. Maybe one way, something that comes to my mind is the patient that presents with the bone sticking out of his arm to the doctor, and if they question the doctor and say, well, doctor, did you rule out a strain or a ligament problem? No, I didn't consider a strain and ligament problem because the bone was sticking out. It excluded those other factors. And Dr. Sastry said when he found the fracture patterns that he found and the lack of other fracture evidence that he would have expected if it was from an external cause, he essentially ruled them out. And I understand he said I didn't consider them, but it's because he ruled them out. It was grossly defective material to begin with, which in a manufacturing defect case, I believe simplest type of product liability case, we have and we had a concrete specification. This was not a theorized specification. It was the defendant's own specification about being austinitic. He then, Judge Perry found him qualified to discuss the properties and characteristics of metals. So if he should then be allowed to explain the properties and characteristics of a non-austinitic stem and how that translates to the fracture. And I don't think there's such a great analytical gap here between what he's saying the problem was with the metal and what happened. And so I believe he should have testified. I was going to reserve a few minutes if that's okay. Thank you. Thank you, Your Honor. May it please the court. I think before I address some of the issues that Mr. Panzeri raised, I'd like to go over a brief summary of the facts in that Mrs. Red was a, she was a very small framed lady. She was 5'2", but she weighed 302 pounds. And because she had such a small frame, Dr. Schauburg was forced, forced is kind of a hard word to use, but he was required to use the very smallest stem that DePue made. Because using a larger stem, given the size of a very small femoral canal, meant that in the original implant he was at risk of breaking the bone. And so he knew, and he testified, we cited it in our brief, that he knew that all of Mrs. Red's comorbidities, the fact that she was morbidly obese, the fact that she had a small frame, she had diabetes, she had psoriatic and rheumatoid arthritis, was taking immunosuppressant therapies. She was at, all of those posed risks for the survival of that stem. And as he very practically put it, what, I was going to send her home and say, sorry, I can't do anything for you? No, I did it and hoped for the best. Now, at the time of the surgery after the stem broke. I wish you'd address this manufacturing defect basis for distinguishing Kruger. Your Honor, as Judge Perry said, the fact that Kruger was a manufacturing, or was a design defect case, and this is a manufacturing defect, really is of no moment. Because the metallurgists in that case, like Dr. Sastry here, did not have the background, the knowledge, the ability in biomechanical, anatomical, and orthopedic issues. But counsel says all you need in a manufacturing defect is the defective product. Well, that's not true, Your Honor. Well, that's why I want you to address this. Okay, I will. I understand what Judge Perry said, and I would say it's intuitively sensible, but I don't understand a lot about strict liability jury prudence. Well, under Missouri law, there has to be proof, and we cited the case in our brief, that there must be shown that something went wrong in the manufacturing process. Why? Why is it not simply enough, I haven't researched the Missouri cases, to say the product's defective? Well, in order for the product to be deemed defective. And with plus evidence of causation. Well, for the product to be deemed defective from a manufacturing standpoint, it has to deviate from the manufacturing processes. Okay, but he opined as to that. Your client's standards were it was to be austenitic, and he finds it wasn't. Actually, Your Honor, that's not quite correct. As Judge Perry noted, this whole issue of the specification requiring the stem to be austenitic, the cobalt chrome to be austenitic, he didn't rely on that in his expert report. In fact, that was nowhere mentioned in his expert report. This specification came up only in the affidavit that was stricken in response to our Daubert motion. Judge Perry said it was late, it was long after discovery, so he didn't even rely on this specification. So how did he come to the opinion that if it's not austenitic, it's defective? I haven't read his report. I'm sure he would. Well, you won't find it in his report, Your Honor. He did not include that in his report. The notion of it not being austenitic, this specification is. And what was the defect cited in his report? He said that, first of all, he thought that the grain size was too large, the grain size of the metal. That was abandoned in this appeal. He also said that some of the crystalline structure, the faceted phase and close-packed hexagonal phase, was not what it should be. But in terms of saying it was and it failed to comply with the specification, that was nowhere in his report because he had not reviewed any of the manufacturing records. Judge Loken, you asked about did Dr. Sastry look at the outside contractor, the Lake City heat treatment. All of the heat treatment for DePue and, for that matter, its competitors in Warsaw, Indiana. Warsaw is a little hotbed of medical device work. Lake City does all of those heat treatments. As you might imagine, Mr. Panzeri said DePue didn't test the heat treatment when the stem came back to it. Well, there's a very good reason for that. To test austenicity, you have to destroy the stem, which is exactly what Dr. Sastry does. The processes, the heat treating processes, are what are validated according to DePue's specifications. And Lake City certified that all of those stems from that lot met the DePue certifications for heat treatment and the metallurgical components. Those records are in our supplemental appendix, and I can call out the pages to you if you like. But that was all produced to Ms. Redd, and none of that was provided to Dr. Sastry. He repeatedly said, I know nothing about the processes. He said something must have happened in the heat treating processes, but I don't know what that is. I'm not a scientist, so let me make this a little simpler, a more simple analogy. Let's say you have a product that is supposed to hold up a certain weight, and it's certified at 100 pounds, and you lift 50 pounds and it breaks. Now, do you need an expert to tell you why it broke, or is the fact that it broke in and of itself enough to prove a product defect? No, Your Honor. Yes, you do need an expert. Who knows why it broke? This is not a reception case. It's either going to be a design or manufacturing defect at that point, correct? Correct. So the expert has to distinguish. So if this product was designed in such a way as to withstand a certain amount of weight and a certain amount of rotations, I think there's some reference to 3 million or something. Cycles, yes. Cycles. And it doesn't do that. And if there's no other explanation, your point is there are other explanations, and the expert says, well, it obviously wasn't, you know, I found some defects in the metal. I don't think it was true. Does he then have to prove why the defects were there? If it fails and you find a defect, is that enough under strict liability? Not under Missouri Law, Your Honor. The cases that we've cited say that you have to prove, the plaintiff has to prove, that this manufacturing defect existed as of the time that it left DePuy's control and that you have to prove that something went wrong with the manufacturing process. That's not my words. Well, no. There's no evidence that there was a change in the product between the time it left DePuy and being implanted, is there? There is not, but it was implanted for four years. It was Dr. Sastry got the stem two years after it had been removed. And then his opinions on this were kind of fluid over time. Initially he said that the stem didn't meet the ASTM standards for cobalt chrome used in medical devices. Well, you backtracked on that. He says, oh, look, I used a faulty test. And then he moved to this other analysis. But in order to conclude that it was not austenitic, he had to sever pieces of the fracture surfaces and mechanically grind them and in the process examine those grindings or those filings, so to speak. And at that time concluded, after all of those millions of cycles and after the destructive testing that he did, that lo and behold, it was not austenitic. It doesn't prove how it was when it left DePuy or what it was like when it was implanted in Ms. Red. But with your example, Judge Malloy, something that's supposed to bear a certain amount of weight, say my aluminum ladder, that doesn't require anything to act on it. And as this court affirmed in the Kruger case, again, Judge Logan, it was a design defect claim, but the same principles apply, that metallurgists were not able to bridge that analytical gap between metallurgy and medical causation. Dr. Sastry was eminently candid in his deposition. He didn't know anything about orthopedics, biomechanics, physiology, anatomy, the nature and direction of forces that apply to the normal human hip, much less one that has been broken down by disease and required a replacement. The suggestion that Dr. Sastry ruled out environmental factors just doesn't bear close scrutiny because he was not qualified in any respect to rule out those other factors. He readily said he didn't know anything about them, but number two, he said he didn't. I didn't look at those things. My focus was on the metal only. And that gap between opining that there must have been something in the process that caused this stem to be austenitic and then saying that was the cause of the failure, that's not permissible under DACA. He just does not have the qualifications, the experience, what have you. The other thing I'd like to point out is he testified in his deposition, Dr. Sastry, that he had the ability to do fatigue testing on metals. Matter of fact, titanium is his metal of focus. This is cobalt chrome molybdenum alloy. Pardon me, I have trouble saying that. And he has done fatigue testing research on titanium. He said he could have done fatigue testing research on a stem of his preferred metallurgical composition, an austenitic cobalt chrome alloy stem, but he didn't do that. In his report, he compared the features of our stem with an entirely different cobalt chrome alloy that we don't use in our stems. So, you know, at the risk of using a cliché, we're comparing apples and oranges. He didn't even compare the right cobalt chrome alloy to the one that was used for Mrs. Redding. But, and I apologize because I can't remember whether it was you, Judge Locum, or you, Judge Moy raised this issue, but the fact that the Smith & Nephew stem that was bulkier, it was able to be bulkier because, as Mr. Panzeri said, Judge, or Dr. Nunley, not Judge Nunley, Dr. Nunley performed an osteotomy, cut a little window in the side of Mrs. Redding's femur to be able to accommodate this larger stem. It was longer. It went beyond the fracture point where the Depew stem had fractured. And 18 months later, that longer, bulkier Smith & Nephew stem fractured. There's no surprise why. Because, like the Depew stem, it was well-fixed in the bottom of the femur, that tough cortical bone. And it broke exactly where that tough cortical bone transitions to the softer cancellous bone at the top of the femur. To the surgeons, this was, and I'm putting words in their mouths, this is a case of the sun rising in the east. No surprise. You know, there was no bone in growth. So Dr. Nunley confirmed that. He was able to remove the Depew stem just with his hands. He didn't have to use an instrument. He didn't have to use trap binds. It was totally loose. And he saw that there was no bone in growth at the top of that stem. That is what caused the stem to fail. Dr. Schauburg, in his deposition, too bad we didn't have a video deposition, because he looked like he was doing his version of the chicken dance. Before your time runs out, would you tell me where in the record to go to clarify this, whether austenitic is a standard of the client, of your client? How does it, if it didn't emerge until after the summary judgment process was well along, and it becomes the main issue on appeal, what's the basis for that? Your Honor, it was produced in our initial production. But what is it? The engineering specification. Can you give me a site so I know where to read it? I can if you bear with me. I may have to refer to the record. But it's in the appendix. It is the appendix. And is there a decent summary? Is there a decent index to the appendix, unlike about 80% of them? No, I didn't favor the court with a decent one, but I will give you the page number when Mr. Panzeri is finished. I see my time is up. Thank you, Your Honor. With regard to Kruger, the metallurgist in that case was going outside of his expertise and criticizing the design when he had no design experience. And design cases involve trying to show alternative designs and theories, and that's why I'm distinguishing the manufacturing case, which does not get into alternative designs. Dr. Sastry is staying within his expertise of metals. He had no experience in manufacturing, it seems to me. There's quite a parallel there. I also, the fact that his report, what he found in his report, he calls it the HCP phase, which means it's not austenitic. The fact that the specification wasn't in front of him when he did his report probably makes his opinion stronger. He found it to be non-austenitic, HCP phase, before the production of the specification that says, are products supposed to be austenitic? My counsel just said those were produced in an issue, the specifications. Produced during discovery, but I'm saying the fact that he didn't have that referencing in his report at the time he found his HCP phase. Because he didn't give it in discovery? I don't understand. I can't recall the chronology of that issue. That would be unusual. There are no other metallurgists in this case to say that anything he did was not proper metallurgy science or anything like that. I'm a little confused. I thought that Judge Perry in her ruling talked about it being austenitic and non-austenitic, or am I not pronouncing it correctly? She had that before her, so it must have been in his report. I guess I'm confused. I don't know that the actual specification that was produced by the defendant was in front of him and that he referenced it in his report, but his report found HCP phase and all the things that render it non-austenitic. He knows what austenitic is from his training and background. He doesn't need the defendant's specification to know that the metal has to come out austenitic. But we have to be able to show that it doesn't comply with the defendant's specification, and that's where the specification is. You just said he knows it's needed when he doesn't know anything about this product? His background in metallurgy, metals, he knows that it has to come out austenitic. Why? Because that has to do with ductility and fracture strength for implants. He's researched the titanium implants in people. The titanium product that he used has the same properties as the alloy product. So he understands the issues. He's done research on the desirable characteristics of metal implants for going into bone and tissue. He knows what the austenitic, the importance of it to be austenitic. He understands that, and he knows he has background in that. So you're saying the reason you need the specifications is because if it's not austenitic, then it's either a design or manufacturing defect, and you have to prove which of them. Correct. Because it could have been design. We have to prove that it didn't match the manufacturing specification. That's how their specification became relevant. Once we determined it wasn't austenitic, and lo and behold, they've got a manufacturing specification that says it needs to be austenitic. In this case, Judge, I just would emphasize in the last seconds, you know, Daubert's recognition of the liberalization of the admission of expert testimony, the importance of the traditional methods for attacking. Daubert talks about summary judgment when there's only a scintilla of evidence. That's all in the briefs. And prior briefs. One last thought. No. I'm sorry. If it's a wrap-up. Yes, just that in this case we feel that the district court, I guess, put on the scientist cap in doing the screening role. And we ask that the exclusion of Dr. Sassner's testimony be reversed. Thank you. Yes, please. This is in the sealed supplemental appendix of the few, because these are confidential proprietary documents. And what Mr. Panzeri described as a manufacturing specification, it's not a manufacturing specification. You'll see starting on page 279 of the appendix, it's an engineering spec. That's what you call it. Okay. And there's a difference between engineering and manufacturing. I know, but just give me the page number. Okay. And skip the wind-up. Just throw the pitch. Is that it, Judge? Page 282 is the page of the engineering specification under the heading microstructure. That's where you'll find the magic word, austenitic. Very good, counsel. The case is complex, but it's been well briefed and argued.